Our sixth case for this morning is Stahl v. Carolyn Colvin, Deputy Acting Commissioner of Social Security. Mr. Horn. Your Honors, Counsel, ladies and gentlemen, I'm John Horn. I represent Plaintiff Appellant. Her limitations were greater than those found by the Commissioner. If she were limited to sedentary work, she would have gritted at the latest as of November 9, 2010, and possibly as of her alleged onset date of June 3, 2010. The vocational expert testified that if her fingering or handling were limited to occasionally, then there would be no work for her above the sedentary, unskilled level. There were diagnoses of neuropathy in the file, and most importantly, there was a CAT scan of July 24, 2012, indicating that her foraminal stenosis was quite severe on the left, at C5 and C6, and marked, but more marked on the right at C6 and C7. And her complaints were that she had difficulty using her hands. She worked a little bit at night taking care of children, and she complained that she couldn't change the diapers. She'd had past work at data entry, and she indicated she couldn't use her hands for that. Now, there was an opinion that went along with that CAT scan, but the opinion came before the CAT scan. The opinion was issued in November of 2011 by one of the treating physicians who examined her, Dr. Pilla, depending on whose spelling you use, and that doctor limited her to occasional handling and fingering. But the Social Security reviewer rejected that opinion because there was no evidence to back it up. But that decision was made in February 2012. The CAT scan that supports the treating physician's disabling opinion came in July of 2012. But rather than consult a physician, the decision-maker decided to play doctor herself. Well, there's a very thorough discussion. I'm just looking at it again. In her opinion of which doctors to believe, she's concerned about inconsistencies in the medical evidence. So, I mean, we obviously are no more entitled to play doctor than the administrative judge or the district court, so we need to find a way of allowing somebody to resolve these different views. Why isn't the ALJ's resolution a permissible one? Because she doesn't have a doctor to rely upon. The reviewer... What do you mean that she doesn't? I mean, she looks at the state agency medical consultant opinion, for example. She looks at, she rejects some of the things. Dr. Andrews also supports that. She thinks Dr. Pilla is accepting too much of her own subjective evaluations, doesn't have enough details. I mean, you know all of this, but she reviews this in some detail. The reviewer never saw the July CAT scan. That's typical. Reviewers sometimes don't see everything. The reviewer didn't examine her as Dr. Pilla did. No, I understand that. But there's no rule that says you have to, maybe there should be, but there is no rule that says you must go with examining physicians only. Perhaps, well, there is a rule that says they're to get greater weight. If they deserve it. I mean, there's an asterisk on that rule. But rules apart as a practical matter. The CAT scan bears out the treating physician's opinion. There were other impairments that were involved, a head tremor. What's her worst disability? The worst is the hands. If the decision maker had found that the hands were limited to occasional handling and fingering. Is that because of the neuropathy? I don't know whether it's the neuropathy or the radiculopathy from the neck. Because those two discs, C5-6 and C6-7, control nerves in the hands. There was a diagnosis of peripheral neuropathy, which implies that the nerves in the hands were the problem. And then there's this CAT scan that indicates there's marked and quite severe stenosis, pinched nerves in the neck that affect the hands. So it's unclear at this point whether it's neuropathy or radiculopathy. She would need an EMG to determine that, a nerve conduction study. But she's going to public hospitals where it's taking a while to get testing done. Then there's the opinion of a treating psychiatrist that she couldn't leave the house, claiming couldn't leave the house. Well, that would have precluded work altogether. If she can't go out and get taken care of, for example, to take care of her hair, on several occasions when she appeared in front of examiners, she was observed to be disheveled. And that would affect her ability to work. The credibility issue involved manufactured inconsistencies. The differences between her testimony and that of her sister were the differences between night and day. Her sister observed her during the day, and claimant testimony mostly described being helped during the night by her son. Whereas when the sister showed up during the day, she just saw the son lying around. The sister did most of the daily activities for claimant as well. Then we have the boilerplate that this court's been criticizing for many years, and it's still being used despite all that criticism. That paragraph is in there, but then she's very explicit as she goes through her findings, right? I understand that language is there. She spends a lot of time going through things, so it's not that she just relies on that paragraph. No, she didn't rely upon the paragraph alone, but she didn't rest on solid ground when she suggested that claimants should have had more treatment. She did have treatment, and she was destitute. She was going to public hospitals. The ALJ complained about compliance, but the rule in this court is that people with severe mental disabilities can't be expected to comply. Likewise, the complaints of side effects. In the Terry case, the complaints of side effects aren't necessary. So the reasons that ALJ gave for discrediting claimant aren't valid. So those are the reasons for reversing and remanding for a new hearing. Okay, thank you. You can save the rest of your time. It's about a minute for rebuttal. Ms. Freeberg. May it please the Court, Counsel Cynthia Freeberg, on behalf of Carolyn Colvin, Acting Commissioner of Social Security. In this case, the ALJ discussed all the relevant evidence, explained her findings, explained the weight she gave to all the record physician opinions, explained her credibility finding, cited numerous examples of inconsistencies in the record. What seems to be missing is any evidence that she can actually do the things that the ALJ thought that she could do. Some of the people who examined the file inferred from information that maybe she could carry a certain amount of weight or manipulate her fingers. And I have to say I'm always amused that the Social Security Administration loves to ask the question whether people can climb ladders, ropes, or scaffolds, and I don't quite know how many jobs in the modern economy require that. But in any event, I'm concerned that there's nothing that says she really can do anything. It's just, well, I don't believe you when you say you can't do this, and I don't believe you when you say you can't do that. Well, the ALJ did give great weight to the state agency reviewing physicians' opinion, Dr. Arjmand, who concluded that Ms. Stahl could perform a range of light work. But how did he know? He reads the file, and there's nothing in the file that actually reveals her doing any of these things. What we have instead is evidence that strikes me probably realistically as a combination of her depression and her physical ailments, that she just lies around house and other people do things for her. Well, Dr. Arjmand did explain the basis for his opinion at transfer page 363. He notes the records he reviewed in explaining his conclusion as he was supposed to do. The ALJ is required to consider the reviewing physician opinions. She did so. She explained she gave it great weight. What do the medical reports say about her neuropathy? Which medical report? Any of the medical reports. What do they say about her neuropathy? Well, her treating physician, Dr. Pillay, notes that she does have diabetic neuropathy. Yes, but neuropathy can be serious and not serious. I apologize. I haven't memorized each of her treating physician opinions. Well, it makes a big difference because if somebody has a severe peripheral neuropathy, they really can't manipulate in any fine way their fingers. They don't have the nerve control over their hands. If somebody has a very mild neuropathy, maybe it's just a little bit of a tremor, maybe they can do more things. So it depends. We have this sentence here in the opinion. Dr. Arjmand provided detail from the medical and other evidence to support his opinion, including clinical findings and reported activities of daily living. But she doesn't say what exactly she finds persuasive. She just says, I find his opinion consistent with the overall record, which is a little baffling. And then on this neuropathy point, when we look at what the vocational expert says that she could do occupationally, ticket taker, that involves taking tickets using the hands, recreation attendant, I don't really quite know what that would involve. What is a recreation attendant? Yeah, what is a recreation attendant? And a mail clerk is going to be using hands, too. I mean, that concerns me, the tie-in between what she says she could do or the vocational expert said she could do and the administrative logic found. First of all, the recreation attendant assists patrons of an amusement facility, performs minor repairs on game machines. Performs minor what? Repairs on game machines. So she's supposed to be able to use a screwdriver and take, like, nuts and bolts out of things? Well, the ALJ found that she could use her hands frequently. She wasn't limited to occasional use of her hands. How did the ALJ tie that in with either the potential radiculopathy or the neuropathy? Did the ALJ say, I don't think she has peripheral neuropathy? I don't think so. No, he found it to be a severe impairment, but she has to do it. It's Stahl's burden to prove the extent of her functional limitations as a result of her severe impairment. But then when we are evaluating this, we have to have substantial evidence to support the findings and the decisions of the ALJ. So, yeah, she's got the burden, but we've got to be able to find evidence in the record that supports the ALJ's decision. Yes, and she has not shown that the ALJ's decision is not supported by substantial evidence. She has not shown that she was further functionally limited. And at this point, Stahl is attempting to rely on the July 2012 CT scan to show additional functional limitation of the use of her hands. However, the timing at which that CT scan came into the record is important in this case. The hearing in this case was held in June of 2012. After the hearing, the ALJ located the state agency reviewing psychologist's MRFC assessment. She properly proffered that to Stahl's attorney saying, I'm going to add this evidence in the record, comment on it, let me know if you want a supplemental hearing. Stahl's attorney commented and said, if you can't issue a fully favorable decision, please hold a supplemental hearing. The ALJ scheduled a supplemental hearing for August 21st of 2012. And when Stahl's attorney requested that supplemental hearing, he did not request an M.E., he did not request interrogatories be sent to an M.E., he did not request any further review by a physician. And before the supplemental hearing was actually held, Stahl's attorney submitted the additional evidence of the July 2012 CT scan. Didn't submit it to her own physician, Dr. Pillai, for an evaluation of what this meant for her functioning. Comes to the supplemental hearing, they discuss the state agency reviewing psychologist's MRFC assessment, they discuss the MRI, and the hearing's over. Stahl, through counsel, even at the hearing, did not request an M.E., did not request that interrogatories be sent to an M.E. But given that she has neuropathy, shouldn't the ALJ have ordered, I don't know how you diagnose the gravity of neuropathy, but shouldn't he have designated some, you know, they have all sorts of doctors they have access to, to examine and advise him what the gravity of her neuropathy was. But it's not a purely adversarial process. You're acting as though this is a district court hearing, that the ALJ has a duty to develop the record properly. Yes. Yes, she does. And she did so here. There's no indication, the evidence was not. But you just kept saying she didn't ask for an M.E., she didn't ask for all these other things, and I'm saying shouldn't the ALJ have said, wow, you know, there are neuropathies in neuropathy, she's got diabetes, so the idea that there's a neuropathy is completely consistent with the medical testimony. It's just the severity. Diabetic neuropathy is one of the big problems of having diabetes. Well, the regulations address when an ALJ should order a consultative examination. That's at 20 CFR 404.1519A. Situations that may require a consultative exam to resolve an inconsistency in the evidence, or when the evidence is insufficient to allow a determination. That sounds right, yeah. But the ALJ didn't find that it was insufficient. But what is the evidence regarding the gravity of her neuropathy? Well, her own physician's treatment notes. She had an E.R. visit in July 2010. Those notes were reviewed. There was no what? Those notes were reviewed by Dr. Arjmand. Well, I don't understand what you're saying. She had an examination. She had an E.R. visit in July of 2010 regarding possible neuropathy. She's going to see her treating physician. Dr. Arjmand reviews the record evidence in October of 2011, explains the evidence that he looked at, and concludes she can do light work. Well, the ALJ says she reduced the claimant to light work to accommodate her obesity, cervical disc disease, and neuropathy with pain and stiffness in her hands and feet. So she acknowledges that's there. She doesn't tell us the level. She says, I added additional postural limitations to accommodate subjective functional difficulties and considered specifically the findings and the neuropathy when I limited her to frequent over-constant use of her upper extremities for fine and gross manipulation. I mean, I'm still trying to get to how she's supposed to do all these things that the vocational expert said, because this doesn't reveal either the extent of the neuropathy. Well, again, it's a claimant's burden to prove the extent of their limitations. Stahl needs to come in and show that she is disabled with objective... Well, she did in many ways. I mean, she testifies extensively herself. She's got the sister. She's got all these other people. She's giving the functional outcome of her feelings. Now, she's not a doctor. There are doctors who support her. And the ALJ doesn't seem to think that there really needs to be a medical examination as opposed to just sitting reading through a cold file. And I thought you agreed with me a little while ago that that burden was not 100% on the claimant. It's also the ALJ's responsibility. It's not an adversarial process. Under the regulation you cited. Correct. And I would also note, again, that there was no indication that Stahl requested a consultative examination or an M.E. at the hearing. I see my time is up, and we will rest on our brief in the government request that you affirm the Commissioner's decision. All right. Thank you very much. You have a minute. One minute. Just a few things, judges. Dr. Gragasin diagnosed peripheral neuropathy on July 12, 2012. And there's no reason there couldn't have been both neuropathy and radiculopathy. An EMG would be necessary to figure that out. All the jobs by the vocational experts involved frequent use of the hands, not occasional, and at Step 5, the burden is not on the claimant. It's on the Commissioner. Any questions? No. Thank you very much. Thanks to both counsel. We will take the case under advisory.